### COWEN et al. v. WINTERS.

(Circuit Court of Appeals, Sixth Circuit. October 3, 1899.)

No. 692.

1. CARRIERS OF PASSENGERS—SALE OF TICKETS—REPUDIATION OF CONTRACT WITH PURCHASER.

A railroad company which authorizes another company to issue and sell mileage tickets good over its road makes such company its agent, and cannot repudiate the contract so made with a passenger, who, in good faith, buys a ticket from such agent, on account of any subsequent disagreement between the two companies.

2. EXEMPLARY DAMAGES—EJECTION OF PASSENGER—IMPLIED MALICE.

Where the general passenger agent of defendant, a railroad company, deliberately repudiated a large number of mileage tickets which had been issued and sold to the public by his authority, and in consequence of his orders plaintiff, who had purchased one of such tickets in good faith, was ejected from defendant's train, such action, by one of its controlling officers,

96 F.—59

was in such wanton and reckless disregard of defendant's duties, and of the rights of its ticket holders, as to be equivalent to an intentional violation of such rights, and to warrant the imposition of exemplary damages.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

This is an action in tort against a railroad company by a person who, after taking passage, was forcibly ejected from a passenger train by the conductor. There was a judgment in favor of the plaintiff below for $1,000 (90 Fed. 99). from which the railroad company has sued out this writ of error. The facts of the case were practically undisputed, and were substantially these: The Cincinnati, Jackson & Mackinaw Railroad Company sold to the plaintiff below a certain mileage ticket, which purported on its face to be good for passage, not only on the line of the selling company, but on the lines of several other railroads, including that of the Baltimore & Ohio, the plaintiff in error. This sale was made June 19, 1897, and the coupons were subject to use at any time during the remainder of the year. This ticket purported to be good over the railroad of the Baltimore & Ohio by virtue of an express agreement, existing in full force at the time of the sale, between that company and the selling company. under which each was authorized to sell mileage good over both roads   On August 24, 1897, the defendant in error boarded a passenger train of the Baltimore & Ohio at Welker, a station in Ohio, to go to Tiffen, another station in the same state, and on the same railroad.   He presented his mileage book to the conductor of the train, and asked him to detach the requisite mileage due for his passage.   The conductor refused to accept said ticket upon the ground that the company had expressly directed him to refuse all mileage tickets sold or issued by the Cincinnati, Jackson & Mackinaw Railroad Company, and demanded that Winters should pay his fare in money or leave the train.   This Winters absolutely refused to do, and demanded that the company should carry him to his destination, according to its contract as evidenced by the said mileage ticket.   Thereupon the conductor forcibly ejected him from the train, using, however, no more force than was essential to overcome the sturdy determination of the defendant in error to pursue his journey upon the tender of the ticket already made.   The answer of the plaintiff in error admits that the conductor acted under its authority in refusing to accept the ticket tendered by Winters, and in ejecting him from its train for nonpayment of the local fare.   Its only defense is that the ticket did not entitle Winters to passage over its railroad.   The circuit judge instructed the jury to find for the defendant in error, and that, in addition to compensation, they might add a sum by way of exemplary damages.

J. H. Collins, for plaintiff in error.

James M. Brown, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

There was no error in directing a verdict for the plaintiff below. The Cincinnati, Jackson & Mackinaw Railroad Company was the authorized agent of the Baltimore & Ohio Railroad Company in selling the ticket presented by Winters as good for passage over the Baltimore & Ohio Railroad.   As an excuse for the repudiation of this ticket, the plaintiff in error shows that on July 31, 1897, it was notified by the said Cincinnati, Jackson & Mackinaw Railroad Company that one of its agents had wrongfully sold a batch of mileage tickets good over the lines of the Baltimore & Ohio Railroad Company, upon a credit, to a ticket broker, who refused to either pay for or return

the tickets, and that it would not redeem any such tickets thereafter taken up by the Baltimore & Ohio Company. A list of these repudiated tickets was at the same time furnished to the said company, to enable its conductors to identify them when presented for passage. The general passenger agent of the plaintiff in error declined the responsibility of guarding against so great a list of "bogus tickets," and by letter of August 2, 1897, among other things, said: "I think the only safe course to pursue would be to instruct conductors to refuse all of your tickets. * * * I dislike very much to adopt this extreme measure, but do not see any other recourse." No other arrangement being made, the general passenger agent, the manager of passage traffic, and the general superintendent issued orders to all train conductors to refuse all mileage books issued by the Cincinnati, Jackson & Mackinaw Railroad Company, to collect local fare, "and refer holders of such tickets to the issuing line for redress." The ticket held by Winters was not one of the tickets wrongfully sold by the agent of the Cincinnati, Jackson & Mackinaw Railroad Company, and we need not concern ourselves as to the rights of one who bought one of that batch of tickets without notice of the circumstances under which they had been originally disposed of. Neither was this ticket issued after the abrogation of the agreement authorizing that company to sell mileage books good over the Baltimore & Ohio Railroad Company. The agreement between the two companies constituted each the agent of the other in the sale of mileage tickets good over both lines. The ticket contained a statement that it was good for passage over the lines of the Baltimore & Ohio Railroad, and this, having been placed thereon by authority of the Baltimore & Ohio Company, constituted a contract between the purchaser and that company, which could not be repudiated without his consent. The contract in every particular was as obligatory upon the Baltimore & Ohio Company as if the ticket had been sold directly to Winters by that company. The case is not in principle different from that which would prevail if a through ticket over the line of two different companies had been sold by one of the companies by authority of the other. Each company would be the agent of the other in respect to tickets of the kind mentioned, and the selling company would bind the other through the agency thus created. Gifford v. Corrigan, 117 N. Y. 257, 22 N. E. 756; Trimble v. Strother, 25 Ohio St. 378.

The conductor only obeyed his instructions when he refused the ticket, and when he ejected Winters for refusing to pay his fare in money. But this does not exonerate the company. The ticket was a valid one, and the company was under the highest obligation to accept it. The conduct of the Cincinnati, Jackson & Mackinaw Company in repudiating the tickets wrongfully disposed of by its own incompetent or dishonest agent did not in any degree justify the Baltimore & Ohio Company in repudiating tickets unaffected by the action of the Cincinnati, Jackson & Mackinaw Company. It may be that the latter company was arbitrary in its determination to dishonor the tickets placed in circulation by its own agent, and it may be that the Baltimore & Ohio Company would have run some

risk and assumed a most inconvenient burden in endeavoring to discriminate between the so-called "bogus tickets" and those which were unaffected by fraud, but neither reason furnishes any excuse for the repudiation of outstanding valid contracts which it was under the highest obligation to carry out. The case is not one of a ticket which on its face had expired, or which for any other reason was not good for the transportation, such as Railway Co. v. Bennett, 6 U. S. App. 1, 1 C. C. A. 392, and 49 Fed. 598; Poulin v. Railway Co., 6 U. S. App. 298, 3 C. C. A. 23, and 52 Fed. 197; Mosher v. Railway Co., 127 U. S. 390, 8 Sup. Ct. 1324; Boylan v. Railroad Co., 132 U. S. 146, 10 Sup. Ct. 50.

The tort in the wrongful ejection of Winters was the tort of the corporation itself. It cannot justify what was done by the fact that its conductor was but obeying the instruction of the company. That instruction was absolutely unjustifiable, in law or morals, and was a breach of both the public and private duty of the plaintiff in error to one who was rightfully on its train with a ticket which neither on its face nor in fact was subject to any question. Neither did Winters know before boarding the train that he would probably or possibly subject himself to the humiliation which came to him, for he had no notice that the company had repudiated the mileage tickets sold by the Cincinnati, Jackson & Mackinaw Company. We have therefore to deal with a case of a passenger lawfully upon the train with a clean ticket, and a clear right to be carried to his destination upon that ticket. He was under no obligation, legal or moral, to pay the local fare demanded, as he had both the legal and moral right to demand passage upon the ticket he presented. He was therefore entitled to recover full damages for his illegal and wrongful ejection. "If," said the supreme court in Railroad Co. v. Winter's Adm'rs, 143 U. S. 60, 73, 12 Sup. Ct. 360, "he was rightfully on the train as a passenger, he had the right to refuse to be ejected from it, and to make a sufficient resistance to being put off to denote that he was being removed by compulsion and against his will, and the fact that, under such circumstances, he was put off the train, was itself a good cause of action against the company, irrespective of any physical injury he may have received at that time, or which was caused thereby."

That he was entitled to recover all his damages is indisputable. But it is said that the court went beyond compensatory damages, and instructed the jury that they might also allow exemplary damages. Upon this subject the court below, among other things, said:

"Every common carrier owes the public a duty in this respect somewhat different from other parties to a contract, and it is for the vindication of that public duty that the law allows the jurors to go beyond mere compensatory damages, and add exemplary damages, where there is nothing but erroneous judgment and reckless disregard of the duties of a public carrier to comply with its contracts of carriage, and recognize the tickets it issues and which are binding upon it."

"Compensation" means recompense for the whole injury suffered. This, in addition to the actual outlay incident to the repudiation of his ticket and the delay in his journey, would include his necessary

and reasonable expense in and about the prosecution of this suit in vindication of his legal right as a passenger. So, the jury would have a right, without exceeding the limits of compensation, to consider the humiliation to which the defendant in error had been subjected in the effort to assert and maintain his legal rights, and the outrage put upon him by his wrongful public ejection from a public railway train, and allow an additional sum in compensation for this injury. Railway Co. v. Prentice, 147 U. S. 101–111, 13 Sup. Ct. 261. Beyond compensation for the injury suffered the jury would not be authorized to go, unless it should appear that the defendant had acted "wantonly or offensively, or with such malice as implies a spirit of mischief, or criminal indifference to civil obligations." "Guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages." Railway Co. v. Prentice, 147 U. S. 101–107, 13 Sup. Ct. 261.

We are not here involved with the question of the responsibility of the corporation for the conduct of the conductor. There is no complaint of excessive force or abusive conduct by the conductor, and no denial of the responsibility of the corporation for the ejection. The highest officials of the company in charge of its passenger business directed that the entire issue of mileage tickets sold by the Cincinnati, Jackson & Mackinaw Railroad Company should be repudiated, and persons presenting them denied passage, and ejected from its trains, unless they would pay the local fare. We have, then, to deal with the ejection of Winters as an act directly authorized by the corporation, being a direct consequence of an absolutely illegal and inexcusable general order made and promulgated through the chief of the passenger department of the company. The conduct of Mr. Schindler, the general ticket agent of the Cincinnati, Jackson & Mackinaw Railroad Company, in his reckless and wholesale repudiation of tickets, improperly disposed of by one of his own subordinates, without any regard to the civil liability of his company to railroads which might receive such tickets from persons holding them in good faith, and of the rights of the general public who might acquire such tickets innocently, cannot be too severely censured. But that conduct affords no sort of excuse for the wider and more reckless order made by Austin, under which outstanding tickets issued before the trouble arose over the so-called "bogus tickets," and tickets subsequently sold by the Cincinnati, Jackson & Mackinaw Railroad Company directly to applicants, were included in one general and sweeping repudiation. It is hard to conceive of a serious legal doubt as to the rights of bona fide holders of such mileage tickets as were outstanding when the agreement between the companies was rescinded. The abrogation of the agreement was, of course, within the legal right of either company, as no time was fixed for the continuance of such a mutual agency. But the discontinuance of the agreement could not affect the general public, who in good faith had acquired such tickets while the arrangement was in effect.

If Mr. Austin, the general passenger agent of the Baltimore & Ohio Railroad Company, had not been recklessly indifferent in this regard, he would, at least, have submitted the matter for the legal

opinion of the company's counsel. If, in pursuance of a legal opinion, he had adopted the course he took, it would have furnished strong evidence that the motive of the company was not bad, and rebutted the obvious implication that he had no regard for the rights and convenience of the bona fide holders of such tickets, and was indifferent to the consequences of his arbitrary order. The entire correspondence between the general passenger agents of the two companies was in evidence. It contains no intimation that the rights of such ticket holders were for one moment the subject of consideration, or the duty and obligation of either company of any importance. In what way could the Baltimore & Ohio best protect itself against receiving a coupon which the Cincinnati, Jackson & Mackinaw Company would refuse to redeem seems to have been the only matter which gave concern. It is hard to believe that he considered for a moment the rights of such ticket holders or regarded the legal obligation of the company as of any importance. Thus, in his letter of August 2, 1897, to Schindler, the general passenger agent of the Cincinnati, Jackson & Mackinaw Railroad Company, after stating that he was unwilling to burden his conductors with a list of 700 repudiated tickets, and that "he did not wish to assume the risk of having any of those tickets accepted by our conductors with a strong probability that they will be repudiated," he proceeds to say:

"I think the only safe course to pursue would be to instruct conductors to refuse all of your tickets, and, if other lines will adopt the same course, I am sure it would soon force the issue, and place you in a position to either receive proper compensation for this block of tickets in the hands of the broker, or else place them in your possession."

Under the date of August 5, 1897, he writes Mr. Schindler as follows:

"Since my reply, under date of August 2d, to your letter, this matter has been gone over very carefully, both by the writer and Mr. Martin, manager of passenger traffic, who has been in the city, and we have come to the conclusion that the only safe course for us to pursue is to dishonor your entire issue of outstanding mileage, which we have accordingly done by instructions to agents and conductors. While we regret very much the necessity which obliges us to take this course, still in view of the fact that you cannot give us any assurances of redemption on tickets that we may honor, and we cannot impose conditions on our conductors to distinguish between the valid and repudiated mileage, we feel that the risk is too great for us to assume."

This correspondence indicates a high-handed determination to protect his company, without the least consideration for the rights of the public who might be bona fide holders of tickets which his company was legally and morally bound to respect. This contemptuous disregard for the rights of innocent holders of such tickets constitutes that degree of reckless disregard for public and contractual obligations as to justify the imposition of exemplary damages by way of punishment of the offender as a public carrier and as a warning to others. The entire want of care for the rights and convenience of bona fide holders of such tickets indicates a conscious or criminal indifference to the consequences, and where this exists exemplary damages may be added, at least where the action is for a tort or in trespass. The reckless indifference to the rights of others is equivalent

to an intentional violation of them. The right to award such damages has been said to rest primarily upon the existence of evidence of a wrongful motive. But it has also been ruled by the highest authority that reckless indifference to the rights of others "is equivalent to an intentional violation of them." Railway Co. v. Arms, 91 U. S. 489; Publishing Co. v. Hallam, 16 U. S. App. 613, 647, 8 C. C. A. 201, and 59 Fed. 530.

In Railroad Co. v. Prentice, 147 U. S. 101–107, 13 Sup. Ct. 263, the doctrine of the supreme court in respect to exemplary damages is thus stated:

"In this court, the doctrine is well settled that, in actions of tort, the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive, or vindictive damages, sometimes called 'smart money,' if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations. But such guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages."

To the same effect is the case of Scott v. Donald, 165 U. S. 58–86– 88, 17 Sup. Ct. 265.

We see nothing in the charge of the trial court which conflicts with the view we have expressed, and the judgment will be affirmed.